Please call the next case. Will the attorneys please approach the podium when you get settled in. Starting with the defense counsel first. Please approach the podium and tell us who you are and who you represent. Good morning, your honors. Sean O'Toole with the Office of the State Appellate Defender. I represent Lamont Donegan. State? Good morning, Assistant State's Attorney Sheila O'Grady-Kroniak on behalf of the people of the state of Illinois. Welcome. Each side is 15 minutes. By then we don't look at our watches. You will have reply time, Mr. O'Toole. A lot of issues. Please get to them. As long as you're moving along, you can argue. Anytime you're ready, Mr. O'Toole. May I please the court? On appeal from Lamont Donegan's first-degree murder conviction, the main issue is the fundamental fairness of the proceedings, and specifically the introduction to Donegan's jury trial of a mountain of inadmissible evidence. In issue one, I identified numerous pieces of evidence that came in because of counsel's deficient performance. And in issue two, I highlight the improper admission of the other crime evidence, which ultimately became the focus of the trial. Before getting into those specifics, I'd like to briefly go over the state's case, because the question in this case will ultimately boil down to the prejudice of this inadmissible evidence. The state had relied on five witnesses, Robinson, Merkson, Lemon, Coleman, and Crowder. Three of these witnesses were in prison at the time of their testimony. One was facing a contempt charge. All of them were gang members. Two of these witnesses, Coleman and Crowder, gave no incriminating testimony from the stand. Three of these witnesses were present at the crime scene, but one could not give an ID, along with two other witnesses at the crime scene who never even testified in this case. The two that did provide eyewitness identifications were conflicting. They were one had Donegan in the front seat, one had Donegan in the back seat. They were also given under less than ideal circumstances. It was late at night. It was dark. The incident occurred quickly, and they were ducking behind trees with cars in between. All of these witnesses were known to the police in the weeks and months after the crime and spoke with the police, yet none gave statements until well over a year later. None made identifications until over a year later, and Donegan was not arrested until about 18 months after this crime. So either these witnesses were telling the police something different in the year after this crime, or the police themselves didn't believe these witnesses, and I think that's the case here. The state understood how weak their case was, that these witnesses were not credible, and therefore they tried to stack the deck with a mountain of inadmissible evidence. How is it inadmissible? The state cited cases where the testimony is presented through 11510 as impeaching, where that same testimony is presented in grand jury proceedings, that is admissible. I don't have any qualms with the overall testimony admitted through the grand jury testimony, although portions of that certainly weren't admissible, including Bruton statements contained in that testimony. But the question initially is the substantive admission of the handwritten statements. Coleman and Crowder and Merkson were all impeached and substantively admitted their prior inconsistent handwritten statements. These statements contained incidents about which these witnesses did not have personal knowledge, as is required by 115-10.1. In the case of Coleman, his prior handwritten statement included Donegan's admission to the other crime, that he had shot at Robinson May 2 days before the offense in this case. That Coleman's handwritten statement also included Pikes and Donegan's admission to the charged offense. So some of the most prejudicial testimony imaginable, clearly inadmissible. In fact, the state concedes in its brief that this testimony was inadmissible, and it was admitted against Donegan in a jury trial. Why wasn't these handwritten statements, could it be concluded that they're harmless in view of the fact that it was the same testimony before the grand jury? Well, as far as the grand jury testimony, number one, Pikes' testimony would not have come in through the grand jury. And in fact, I don't think it came in through Coleman's grand jury testimony, because it was a co-defendant's statement that was not subject to cross-examination. Now, as far as Donegan's admissions, like I said, this is some of the most prejudicial testimony imaginable. So the fact that the state was able to bolster the grand jury testimony with this prior handwritten statement does give rise to prejudice in this case, particularly when viewed in the context. As I mentioned, the state's case was weak, and I'm about to go through several pieces of inadmissible evidence that came in that certainly undermines confidence that the jury convicted Donegan based on only admissible, competent evidence. So yes, Donegan's admissions would have come in through the grand jury testimony, but they were bolstered improperly by the handwritten statements. And these witnesses disavowed the grand jury testimony in the stand. Both witnesses said they gave this grand jury testimony under pressure from the police. It happens in every 11510 case. That's why we have 11510. It's been around for 30 years. Well, not in every case do we have improperly admitted handwritten statements. That's true. But you did have that in Morales and in Harvey, which are first district cases. Morales was written by Tice and Justice Tice, and Harvey was written by Justice Gallagher, two pretty smart people. Just this issue. So when you have it in, it's hard to show prejudice. How is your case different in terms of showing prejudice than that in Harvey and Morales? I'm not familiar precisely with the facts of those cases, but I would argue that, number one, I believe it's six pieces of inadmissible evidence that came in because of trial counsel's ineffectiveness, not to mention the other crimes evidence, which I argue in issue two became the focus of the trial. Eight separate witnesses testified to other crimes evidence in this case. There's a huge risk that the jury convicted based on propensity. There was no forensic evidence in this case. There was no confession. Does that mean these people weren't killed? Does it mean they weren't killed? Certainly they were killed, but nothing ties. For anybody else to this crime, right? Is that correct? Well, that's not the defendant's fault. That's not the defendant's problem. Well, I don't know. I see the argument is, but not today. Going back, though. To your point on distinguishable case law, I'd point this Court's attention to People v. Filia, a 2011 case in the Second District where this precise error in connection with a prior handwritten statement and an assault and brutal violation combined in a case with two eyewitness identifications to constitute reversible error. Okay. The Bruton problem? Yes. In this case, the co-defendant and the defendant were tried together before separate juries. That decision was made obviously in anticipation that there would be statements coming in that were not going to be admissible against both co-defendants. And counsel made the highly unreasonable decision not to ask the jury to leave when Coleman's prior inconsistent handwritten statement was admitted in which co-defendant Pikes, in great detail, explained his and Donegan's participation in this offense. So counsel's reasoning was that she did not want the jury to become suspicious if she asked them to leave the courtroom. That to me is unreasonable. The whole purpose of having separate juries was to pull the jury out during this testimony so that they did not hear the highly prejudicial testimony of the co-defendant, implicating the defendant in the crime despite the fact that he was not available for cross-examination and the statement was not admissible under the co-conspirator exception of the hearsay rule because it occurred after the offense. The statement makes the argument that Pikes' actual wording in the statement, the alleged Bruton problem, did not involve specifically Donegan. Is that incorrect? They're referring to the statement, the Bruton statement that popped up in Crowder's handwritten statement. In Coleman's prior handwritten statement, Pikes specifically named Donegan as an offender, detailed precisely how the crime occurred, and explained that Donegan was, in fact, a shooter in this case. So with regard to Crowder's, like I said, there were two Bruton errors here because Crowder's prior inconsistent statement also included a statement by co-defendant Pikes in which he said that Pikes complained to Crowder that no one had finished the business he had left on Corliss. Clearly this is a reference to the Mosley shooting which occurred on Corliss. And under the State's theory of the case where Donegan and Pikes acted together, this certainly should have been kept out against Donegan. Pikes was not subject to cross-examination on this statement. He could not ask Pikes whether or not Donegan was present when he committed this business that he had left, and therefore the State's argument that he didn't mention Donegan by name in that particular statement does not cure any of the prejudice here. But the key Bruton statement is in the Coleman prior inconsistent statement, which does detail Donegan's involvement. And I would just, again, stress how unreasonable counsel's decision not only not to object to this, but to specifically waive this issue by not asking the jury to leave because she didn't want the jury to become suspicious. There's nothing more that the jury could have believed that they were going to hear than Pikes implicating Donegan. The other issues which counsel failed to object to, there was a lot of lay opinion testimony in this case. Statements made both in Coleman and Crowder's prior statements that were ambiguous, but which the State elicited from these witnesses in the prior statements explain what you thought he meant when he said this. And, again, under People v. McCarter, which is directly on point here, a similar statement were found to be inadmissible testimony. In this case, Coleman said when Pikes said he was going to get a car, that meant he was going to steal a car for a shooting. When Donegan said he wanted retaliation, that meant he was going to kill a gangster disciple and he wasn't necessarily going to kill Robinson, completely without foundation. Why isn't it, had they argued that, would that have been okay? To me, the McCarter exception, whatever you want to call it, doesn't apply to obvious inferences. How is it not obvious to anybody that when Donegan is out trying to shoot at people on day one, he gets hit by a car and goes back and shoots at those same identical people later, that he meant to shoot those same people? Well, I parsed the five of these statements out. A couple of them are, in fact, more clear. Some of these, do business, business he left, get a car, I mean, these are ambiguous statements. And, regardless, it's the province of the jury to interpret these statements. If the jury wants to make that inference, fine, but it's not up to the state to invade that province by asking its witnesses to clarify and give lay opinion testimony. In McCarter, they didn't address the second prong of Strickland, right? They said it validated the first prong of Strickland, written by Joe Gordon, a very smart fellow. They didn't address the second prong. Well, it addressed the prong. It found the evidence was too overwhelming in that case. And I would distinguish McCarter based on the fact that the gun, the murder weapon, which was linked to the defendant, McCarter, was found in the defendant's mother's home. There was direct eyewitness testimony by people who knew the defendants, given under circumstances that were much more ideal than the eyewitness identifications here. There was no conflicting identification, as there was here. And, frankly, there's more in admissible evidence in this case. I haven't even gotten to the other crimes evidence yet, which essentially took up half the trial. Eight witnesses testified in the other crimes. Well, let's go back to that, actually. I don't know if you were here from the beginning. I got my cases confused. And so I started on it, but he had the same issue in the first case. So of the eight witnesses who testified regarding the first shooting, the shooting by Donegan, where he gets hit by the car, how many of those were present and testified regarding the second shooting? Three. Okay, so that's five of them. Are you saying five? Five. Well, there was a blend here, Your Honors. Coleman and Crowder, I'm sorry, Coleman certainly was, he came on the scene of the other crime immediately afterwards. The State brought in all these prior statements of him saying, Donegan telling him he just got run over, he had just fired his gun. So he was present for that, but he was also present in the moments leading up to the other shooting. But the fact remains, the State didn't have to elicit all this testimony from these eight witnesses, even if they were going to call them for the charge defense. The uncharged defense, first of all, was not. Is there a standard, though, they don't have to do it, that they should keep evidence out because we want them to or you want them to? Well, with regard to other crimes, the standard is certainly the State needs to limit their introduction of the other crimes evidence. It goes in for anything except propensity, right? Illegally at all. It goes in for anything except propensity. But in Thigpen, this Court said, when considering other crimes evidence, courts must consider whether necessary, whether that evidence is necessary, or whether the State has other means of making its point. And as I point out in the subsection A of this argument, what was the motive in this case? The motive was the fact that Donegan got ran over by a car. The motive was not that he shot at Robinson while he was riding on a scooter. You make that point, and you're afraid to argue that the State should have all been able to say he got hit by a car. Exactly. Because I'm pointing out that when he was hit by a car, he was shooting at these same people. That's not relevant to this case. It might be relevant. But the State should be able to consider it. Well, it might be relevant, but it's certainly not admissible as another crime. Going back, you were here for it. They argued the case heard. It's not argued today. It's different. But prior violent acts, it is not proper for the State to put in evidence that Donegan was shooting at these same people or people of the same gang the day before, two days, a couple of days before? I heard the State's earlier recitation of heard. It was actually incorrect. The State in heard introduced that testimony of the prior crime for purposes of intent, not for purposes of motive. The motive in that case was separate, and the Court pointed this out in heard. The motive in that case was the defendant was angry that the girl broke up with him. There's the same distinction in this case. There's the shooting, which is not relevant to motive because it's illogical. You're not motivated to shoot someone because you're shooting them. The State's motive in this case was anger. Donegan was angry because he got ran over by the car. And I can quote on four separate occasions in the State's closing argument what they explicitly told the jury the motive was in this case. They said, Robinson tells you why this went down, and I'm quoting here, because Lamont Donegan gets hit by that car. You know why co-defendants went to that sidewalk with their car and shot it and killed Loren Mosley? Because Lamont Donegan was hit by that car the day before. And I could go on and on. Wasn't that part of an ongoing? I mean, there was also testimony that it wasn't just the run. The getting hit by the car was part of the ongoing gang warfare that was going on between the Four Corner Hustlers and the Gangster Disciples. So there was a lot of testimony that there was business that needed to be taken care of, and all of those acts that had to do with the ongoing gang warfare. Don't you think the jury has considered that as well instead of just being hit by the car? I mean, there was testimony that there was ongoing gang warfare, wasn't there? But the question is, how far back with regard to – remember, these are uncharged offenses. The general rule, the de facto rule is these are inadmissible. How far back do we have to go in order to let the state prove its motive? That's the question. A couple of minutes? Because right before you get hit by the car, he's shooting at you. I understand. Is a couple of minutes okay? Could you cite a case with a proposition that a couple of minutes or a few seconds is too long of a period of time for being a bad act at the time that you're going? But I don't think looking at this as a matter of time is necessarily helpful here. Not me. Well, I took some of referring to the quantitative amount of evidence. I mean, there's evidence that in pretrial proceedings, there's evidence that other people got shot that were members of these gangs, and that this thing went back years. I mean, the question here is, does the state have the right to bring in other crimes evidence, not for anything but a limited purpose? Their limited purpose in this case, they said, was motive. The crime that they're referring to, a shooting, did not arise to motive. The motive was the anger that Donagan felt when he was hit by the car. And so the ongoing act of warfare between these two gangs had nothing to do with it. It was all just being bumped by a car. Like I said earlier, it could have been relevant. It certainly was relevant. The question here, was it more prejudicial than probative to the limited purpose for which other crimes evidence is admissible? If other crimes evidence is admissible only to prove motive, and here I'm saying that the motive. I think we can agree that the state has a right to prove motive. I think what you are quibbling about is what they used to prove that motive. And you feel that the using the bumping of the car was not, shouldn't have been allowed. No, that should have been allowed. That should have been allowed. Sure. But the gang warfare shouldn't? Correct, because it's too prejudicial. And it doesn't actually go to motive. The motive itself was being hit by the car, as the state said four separate times. It doesn't also go to identification. When you first started off today's argument by saying these eyewitnesses are weak and the other guys are liars. So obviously you think identification is an identification case is what it is. Since you didn't say you did it. It doesn't go to identification. The same guy, Don again, is shooting at these same guys the day before, gets hit by a car by one of these guys, goes back and shoots at them again the very next day. Doesn't that go to identification? It could have, but that's not what the state asked for it to come in for. So they're limited. So when the state foolishly, stupidly, the trial court says, it goes to motive, and the judge, as usual, everything shorthand, yeah, yeah, yeah, it goes to motive. They're restricted on an appeal. Aren't we allowed to affirm on any basis in the record? This clearly goes to identification, the fact that the trial court and the state can only think of motive. Does it not go to identification? Well, the question here is how did the jury interpret this evidence? Not how the judge or the state did. How do we ever know? Because they were told it was for motive in the instruction. Well, wouldn't it hurt you more if they were instructed correctly that it involves identification as well? You know, if you have more factors, of course they could consider it. But isn't it against the defense? Doesn't it harm the defense, I should say? Well, that's a hypothetical. That's not what occurred here. What the jury was told. But my question is not hypothetical. Normally we ask hypotheticals. I almost never ask hypotheticals. I'm asking you, doesn't the evidence in this case of Donegan shooting at these same people the day before, being struck by a member of that same gang the day before, support identification should have been properly admitted for the purpose of identifying Donegan as the shooter on day two? I believe it could have been admitted as identified. I appreciate it. Most lawyers are just clammed up. And your brief is great. You heard it as you were talking, but I was talking over you as I always do that too. The brief is great. You brought this down, and it's great. And I think the key here is, like I said before, not whether the state could have brought this in as identity testimony, but how the jury took this testimony. And the key point here is that the jury was not contemporaneously instructed. So they're sitting throughout the entire trial not knowing that this testimony is for a limited purpose, whatever it may be, motive or identity. They think that this testimony is admitted for propensity, because that's the way most, as the courts have repeatedly said, that's the way most juries interpret this testimony. But there are, as you say, the IPIA says they should do that, but then there are several cases from our Supreme Court saying, you know, guess what, that happens a lot. They have a reverse for that. Not alone that I've found, but here I'm going to move on a little bit and say even if this evidence was admissible for that limited purpose, the manner in which the state brought it in, like I said, eight witnesses brings this case in line with Bedoya, where the prior crime does overshadow, the uncharged crime does overshadow the charged offense. Well, in Bedoya the state put in evidence of three prior shootings by a drunken guy from Milwaukee, I think one was a copper, who shot at the Archbishop's house, the Cardinal's house. And so they put that in, and they tried that case first and lost, but they're not guilty. And then the state used the evidence of the not guilty cases, again shooting at the Cardinal's house, to show that where these drunks were driving around from Milwaukee, driving around shooting at houses or buildings in Chicago, as proof that they intended to murder a bouncer. That's a little different than the day before, shooting at the same guys, don't you think? Well, I agree, but here the question is not why the evidence came in, and we're stipulating, for the purposes of this portion of the argument, that it did have a proper motive. The question is, in Bedoya, I think the court was concerned, not with the probative nature of the testimony,  so that the risk that the jury would convict based on propensity or emotion, as you said earlier in the earlier case, is too high. And in this case there were even more witnesses than in Bedoya, where the court did reverse. You mentioned that in Bedoya the state tried to convict of those other crimes earlier. The state didn't even bring these charges against Donegan in this case, so I think they were a lot less probative. Robinson, who claims now at trial that he was shot at, didn't go to the police and tell the police that Donegan was shot at. Well, they're gangbangers. I mean, they don't, right? You can argue, oh, they do all the time. We do get some gang cases where gang members cooperate, but not often. But these same witnesses who were willing to, Merkson and Lemon in particular, who were willing to identify Donegan as the shooter in the charged offense, Merkson in particular did not identify Donegan in the other crime. The state had to impeach him with that testimony. Which, again, happens in, what, 90% of our gang cases? It's in there. It's around the vast majority. I don't think 90% of gang cases have this extent of other crime evidence, not to mention the six instances of inadmissible testimony. And within those six, multiple occasions. Quantitatively, you're talking about, I think, over half of the state's cases against Donegan was inadmissible evidence. And you can't say you have confidence in the outcome when there's that amount of other crimes evidence, prior inconsistent statements that were inadmissible, brutal statements, impeachment of witnesses. I didn't even get to this point. Impeachment of witnesses who did not do any affirmative damage to the state's case. Well, they claim they were coerced, right? And that kind of falls under the idea. Right, they said that. No, they didn't say they were coerced until they were confronted with their prior statements. The state didn't have a right to confront them with their prior statements because they did no affirmative damage to their case. Impeachment is to destroy the credibility of a witness who hurts your case. Neither Coleman nor Crowder nor Merkson hurt the state's case in any manner. They refused to help the state, but there's a distinct line drawn in the McCarter case that deals with this as well, and Filia does as well, between witnesses who hurt your case and witnesses who refuse to help your case. Anything else? No, I'll rest on argument three and then just ask this Court to reverse based on the sheer amount, avalanche, as you said earlier, of other crimes and inadmissible testimony. You'll have to have a reply. Thank you. Thank you, Counsel. Mr. Grady. Good morning, Your Honors. Again, my name is Sheila O'Grady-Kroniak on behalf of the people of the state of Illinois. In this case, defendant is claiming ineffective assistance of counsel based on a failure to object to allegedly improper evidence. However, each of the pieces of evidence that were allegedly improper were properly introduced at trial. Defendant makes no freestanding claim of error by the trial court in admitting these pieces of evidence. With the handwritten statements, defendant claims that they did not fall under the rubric of personal knowledge, but the witnesses did have personal knowledge of the confessions. And even if the statements were insufficient for personal knowledge, they were admissible as impeachment, and defendant concedes that they were properly introduced through the grand jury testimony, and so any error that would have resulted from this introduction of evidence would have been harmless. With the allegedly improper opinion testimony, all of the statements that defendant points out in his brief are the witnesses testifying to their own understanding of what defendant meant and why he did what he did. And again, none of the statements went to ultimate facts or opinions in the case and did not intrude upon the province of the jury. They were still able to make the obvious conclusions that when the defendant has been saying that he's been targeting gangster disciples and he's going to go do business and he asks them to come along, that obviously he's going to go retaliate against the gangster disciples. With the claim that the witnesses did not do any affirmative damage to the state's case, the witnesses were asked on direct examination if they spoke to the police and immediately stated that their handwritten statements were coerced by the police in exchange for deals or promises on their pending cases with the state, and that absolutely affirmatively damaged the state's case by calling into question the credibility of the police officers that also testified at trial. With the co-defendant statements, there was no brutal violation. When Pikes described the shooting, it was considered an adoptive admission because he stated that the defendant was present when Pikes made these statements and did not contradict or deny Pikes' statements of his involvement. It could be properly construed as an adoptive admission by defendant. With the other crimes evidence, it constituted a very small portion of the entirety of the state's case. With the other crimes evidence, all of the witnesses that testified to the prior incident also testified as to the main shooting that was in question in the case. It all properly went to the motive where defendant was shooting at the gangster disciples and then struck by the car and then shooting at the same group of gangster disciples on the next date. With the no contemporaneous jury instruction, the courts have previously held that it's not needed when there is a proper jury instruction at the close of trial as there was in this case. In contrast to Bedoya, which defendant relied on in his brief, in Bedoya the court specifically found that there was no nexus between the prior shootings that were used in the other crimes evidence and the shooting that was at issue at trial. In this case, there is absolutely a proper nexus between the two shootings. Defendant is specifically targeting Quintez Robinson in the first shooting and Quintez Robinson is standing next to Lorne Mosley when he is killed. Defendant is also attempting to minimize the evidence that was presented against him at trial. The evidence was overwhelming at trial in this case. He was identified by two eyewitnesses as shooting at Lorne Mosley. Furthermore, defendant has this personal .45 high point revolver with distinctive orange sights. That revolver was recovered after the defendant was seen in the alley with it. He throws it or he drops it. And the medical examiner testified that the bullet from Lorne Mosley's body came from that revolver, from defendant's personal .45 high point revolver with the distinctive orange sights. The totality of the evidence at trial shows that no rational jury, no rational trier of fact would have acquitted defendant given the amount of evidence against him. Trial counsel did raise several objections at trial, but all of the evidence was properly admitted. And so there is no ineffective assistance of counsel, and the other crimes evidence was properly introduced to show defendant's motive in targeting this group of gangster disciples. Can you address the Bruton issue as to Coleman? Coleman's statement, with Coleman he testified that he had the conversation with Pikes several months later that no one finished the business that he left. On its face, that statement does not implicate the defendant. And so there is no Bruton violation where he says that it was him that did the shooting. There's no Bruton violation. There's no Bruton violation because it doesn't implicate the defendant. Furthermore, that statement could also be considered a co-conspirator statement. The conspiracy did not begin and end here with solely the shooting of Lorne Mosley. The conspiracy here is the ongoing criminal enterprise. There was sufficient independent evidence at trial of an ongoing criminal enterprise of a gang war between the Four Corner Hustlers and the gangster disciples. It started before the Mosley shooting, and it continued well after the Mosley shooting. Pike's statement that no one finished the business that he left could be construed as encouraging further criminal enterprise to finish the business that he did leave and so would not violate Bruton where it is a co-conspirator statement. Anything else? I believe that's it. For those reasons and those stated in our brief, we ask that you affirm the defendant's conviction for first-degree murder. Thank you. Mr. O'Toole, briefly. Mr. O'Toole, you started by saying you cited a recent second district case, Philia, and unfortunately my fact sheet is a month old. Do you file that ticket and motion to cite additional authority? I cited it in my reply brief because it came out after my opening brief. Can you spell that? F-I-L-L-Y-A-W. But it's in your reply brief. It's in my reply brief. Very good. Mr. O'Toole. Mr. Honor, briefly. The state claims all of this evidence that the counsel failed to object to was admissible. That's a reversal from the position in their brief. They claim that they concede in their brief that the handwritten prior and consistent statements were inadmissible without personal knowledge. Their claim that counsel properly objected to that evidence based on relevant foundation grounds, as I said, is dealt with in Philia. They concede just now that the lay opinion testimony were these witnesses' own interpretation. That's clearly inadmissible testimony. With the impeachment, again, the state tries to argue that because Coleman and Crowder disavowed these prior statements, they can be impeached. But as I said in the brief, they don't disavow these prior statements until they're confronted, until the state attempts the impeachment. But they can be used for substantive evidence, right? Correct. That's the problem you have, is it not? Well, is that so they cannot be impeached with them, but they can ask those questions on cross for under 11510 to put all of them in through the grand jury. And rebuttal, yeah. How is it not harmless error when everything they say is going to be coming in in the grand jury, and now you have a cumulative, I guess, idea, and you've rejected cumulativeness in Harvey. Well, the question is how much of those grand jury statements would come in and how much of that prior handwritten statement would come in substantively. And as I've identified in subsections 1, 2, 4, 5, and 6, the large portions of those statements would not have come in due to various reasons, lay opinion testimony, brutal statements. So the question is, looking at it in totality, yes, even if they couldn't impeach these witnesses, they could bring in their substantive statements. I would also point out that the jury was not correctly instructed in this case because their jury was told nothing would prevent the introduction of these substantive statements from coming under as impeachment. But also looking at it in totality, cumulatively, like I said, about half of all of this stuff would not have gotten the jurors' ears. And that's something that the head counsel performed up to her responsibilities. With the Bruton case, the state makes a new argument that it did not make below or on appeal that this was an adoptive admission. But the state has cited no authority with regard to that. And the other crimes, the state has still not explained why the shooting itself was needed to prove motive, considering their closing argument stating that the running over of the car was the motive. And I'd also point out, because this question came up earlier, too, with regard to Bedoya, if we concede for purposes of Subsection B that there was some relevance to this testimony, the state argues that in Bedoya the court found no nexus between the prior crimes and the charge defense. And that's why it was able to reverse. But the Bedoya court was clear. Even if we were to find relevance in the other offense evidence, we are persuaded the way in which the evidence was presented, received, and argued requires reversal of defendant's conviction. And that's the argument I'm making in Subsection B, that the eight witnesses, the focus on this other crime, calling all the witnesses, impeaching the witnesses, bringing in their prior statements, all with regard to the other crime, brings this case into line with Bedoya. And finally, I would just mention the state relies heavily on the recovery of this gun. The recovery of the gun was part of some of this inadmissible testimony. Crowder's prior handwritten statements saying that that gun had a body on it, Donegan told him that that gun had a body on it, that would not be admissible. And if you listen to the police officer's testimony, he chased a bunch of men, found the gun, detained the men. There's no evidence that Donegan was in that group of men. So the connection between Donegan and the murder weapon is tenuous at best, and therefore the evidence is not so overwhelming where this court can overlook the extremely high amount of other crime and inadmissible testimony. Thank you very much for the arguments and the fine briefs. This case will be taken under advisement, and this court will be adjourned.